Kevin J. Patariu, Bar No. 256755
KPatariu@perkinscoie.com
John D. Esterhay, Bar No. 282330
JEsterhay@perkinscoie.com
PERKINS COIE LLP
11452 El Camino Real, Ste 300
San Diego, California 92130-2080
Telephone:  +1.858.720.5700
Facsimile:  +1.858.720.5799

*Attorneys for Plaintiff and Counterclaim-Defendant*
*Shenzhen Carku Technology Co., Ltd.*

Sean A. O'Brien, CA Bar No. 133154
sao@paynefears.com
PAYNE & FEARS LLP
Attorneys at Law
4 Park Plaza, Suite 1100
Irvine, California 92614
Telephone: (949) 851-1100
Facsimile: (949) 851-1212

Alex W. Ruge (*pro hac vice*)
SHERIDAN ROSS P.C.
1560 Broadway, Suite 1200
Denver, Colorado 80202 5141
Telephone: (303) 863 9700
Facsimile: (303) 863 0223
E-mail: aruge@sheridanross.com
E mail: litigation@sheridanross.com

*Attorneys for Pilot, Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Shenzhen Carku Technology Co., Ltd., | Case No. 2:22−cv−08471−HDV−KS |
| Plaintiff and Counterclaim-Defendant, | **JOINT STIPULATION PURSUANT TO L.R. 37 RE: SUPPLEMENTING PROTECTIVE ORDER** |
| v. | |
| Pilot, Inc., | **Date:** August 9, 2023 <br> **Time:** 10:00 am |
| Defendant and Counterclaim-Plaintiff. | **Discovery Cutoff:** Dec. 12, 2023 <br> **Pretrial Conference:** Feb. 26, 2024 <br> **Trial:** March 12, 2024 <br> Judge:          Hon. Hernán D. Vera <br> Magistrate:  Hon. Karen L. Stevenson |

I.      INTRODUCTION .............................................................................................. 1

II.     FACTUAL BACKGROUND ............................................................................. 2

        A.      Carku is a Leader in Lithium Based Vehicle Jump Starters ............... 2

        B.      Pilot's Campaigns To Weaponize Its Patents .................................... 4

        C.      Carku Asserts Claims of Non-infringement, Invalidity, and
                Various Tort Claims Against Pilot ...................................................... 5

        D.      The Northern District of California's Model Protective Order .......... 6

                1.      Heightened Source Code Provision ......................................... 6

                2.      Patent Prosecution Bar ............................................................ 7

III.    ARGUMENT .................................................................................................... 7

        A.      There is Good Cause to Implement Heightened Protection for
                Carku's Source Code ......................................................................... 7

        B.      There is Good Cause to Impose a Narrow Patent Prosecution
                Bar ................................................................................................... 11

IV.     Conclusion ...................................................................................................... 14

V.      Pilot's Position: ............................................................................................. 15

        A.      Carku's Position Should Be Stricken. ............................................. 15

        B.      Pilot's Introductory Statement ........................................................ 15

        C.      Argument ......................................................................................... 17

                1.      Legal Standard - Carku Bears the Burden of Showing
                        Specific Prejudice or Harm *Will* Result if the Protective
                        Order is not Modified. ........................................................... 18

                2.      Carku Fails to Present Any Competent Evidence that
                        there Remains Relevant Confidential Source Code or that
                        Carku Will Suffer Any Harm. ................................................ 19

                3.      There is No Good Cause for Onerous Source Code
                        Review Provisions. ................................................................ 20

                4.      There is No Good Cause for a Prosecution Bar. .................... 23

Pursuant to Local Rule 37-2, Plaintiff and Counterclaim-Defendant Shenzhen Carku Technology Co., Ltd. ("Carku") and Defendant and Counterclaim-Plaintiff Pilot, Inc. ("Pilot") respectfully submit the following Joint Stipulation on Carku's Motion to Amend the Interim Protective Order to add additional protections for source code and for a limited patent prosecution bar modeled after optional provisions that may be used as part of the Northern District of California Model Stipulated Protective Order For Litigation Involving Patents, Highly Sensitive Confidential Information And/Or Trade Secrets.

**CARKU'S POSITION:**

## I.      INTRODUCTION

Carku brings this action against Pilot to preserve its automobile jump starter business, halt Pilot's meddling, and recover damages from Pilot for its tortious activities.  Pilot is a competitor in its own right and licenses its patents to other jump starter manufacturers.

One of the main disputes in this lawsuit is whether Carku's customers' products infringe Pilot's United States Patent Number 11,376,971 ("'971 Patent"). They do not.  But, to prove that its customers' products do not infringe the '971 Patent, Carku will need to produce its source code, which Carku has developed and refined for over a decade now, and other highly sensitive information.  Carku's source code is the crown jewel of its jump starter products, which run on powerful lithium-based batteries, and is what makes its products safe for consumer applications.

To safeguard its trade secret source code and other highly sensitive information.  Carku seeks two additional discovery protections found in the United States District Court for the Northern District of California's Model Protective Order for patent cases: heightened protections for Carku's source code and a two-year prohibition on anyone who receives Carku's source code and other highly

-1-
2:22–cv–08471–HDV–KS
JOINT STIPULATION RE: SUPPLEMENTING PROTECTIVE ORDER

sensitive confidential information from prosecuting Pilot's future patents or engaging in other competitive decision-making on Pilot's behalf.

Good cause exists to include these two commonsense and fair provisions in the interim protective order already in place.

## II.    FACTUAL BACKGROUND

### A.    Carku is a Leader in Lithium Based Vehicle Jump Starters

Founded in 2011, Carku is one of the largest and most well-known manufacturers of portable vehicle jump-start devices in the world.  Declaration of Ming Cheng ("Cheng Decl.") ¶ 2  Carku's jump starters, which contain a lithium-ion battery, can be connected to a car or truck to provide supplemental power to start a vehicle engine within seconds when the vehicle has a dead or depleted battery.  *Id.*

Lithium-based batteries have revolutionized many markets but it has fundamentally changed the market for automobile jump starters.  Lithium batteries present a number of crucial advantages over more traditional alkaline batteries, especially for portable devices that require high energy production such as automobile jump starters.  *Id.* ¶ 3.

But, lithium-based jump starters require incredibly complicated features to ensure safe use for customers.  Unlike alkaline batteries, lithium batteries present chemical and electrical hazards.  Lithium batteries can overheat or ignite under certain conditions such as poor design, improper assembly, physical damage, or other issues.  Once ignited, these batteries can be especially difficult to control. The need for robust safety features is even more important when using lithium batteries in high-energy output products like car battery jump starters.  *Id.* ¶ 4.  For these reasons, safe lithium-based jump starters eluded many manufacturers and distributors.  For those companies like Carku who discovered how to safely manufacture lithium-based, the market for safe, lithium-powered jump starters is incredibly competitive and very profitable.

Carku designed and manufactures its jump starters to address the inherent safety risks associated with lithium batteries and make them as safe as possible for consumer applications. Carku's safety mechanisms, held as valuable trade secrets, are essential to its success in selling its jump starters. Cheng Decl., ¶ 5.

Carku's jump starters have a microcontroller and other circuitry that determine the circumstances when power is connected from the internal battery to the clamps, which can be connected to a vehicle. The circuitry is on a printed circuit board ("PCB"). Different PCB model numbers are used to differentiate between different circuitry on the circuit boards used in a particular device. The microcontroller on the circuit board can be programmed with software that may be specific to each customer. The source code contained in Carku's microcontroller and other circuitry is the key feature that makes its jump starters safe for consumers. For example, Carku's jump starters, supported largely by its source code can detect unsafe situations such as a consumer putting the clamps on the wrong terminal or degraded battery and not discharge the intense power level required to jump-start an automobile. Carku has continued to develop and advance its innovative, patent-protected and trade secret core technology for so-called "smart" jump starters (DSLI technology). *Id.* ¶ 6. Indeed, Pilot also claims that its "patented safety mechanisms were essential to the success of the overall product." Declaration of John D. Esterhay ("Esterhay Decl.") Ex. C (Pilot's First Amended Counterclaim) at ¶ 22. Pilot licenses its patented "safety switch" to Schumacher Electric Corporation and potentially others. *Id*. at 20. Pilot also purportedly sells jump starters. *See* Esterhay Decl. Ex. D (Pilot's Answer) at 7 ("Plaintiff's allegations and claims are barred, in part or in whole, by the privilege of competition.").

Carku designs and manufactures its jump starters for a variety of customers. These customers then sell Carku's jump starters through a variety of retail channels. For several Carku customers, the Amazon Marketplace, through customer's online

stores accessible on www.Amazon.com, is the primary channel for retail sales of Carku's Jump Starters.  Cheng Decl., ¶ 3.

**B.     Pilot's Campaigns To Weaponize Its Patents**

Pilot is Carku's competitor.  As a competitor, for years, Pilot has sought to weaponize its patents, especially those related to Pilot's safety mechanisms, against Carku, Carku's customers, and other third parties that sell lithium-ion-based batteries.  Between May 2017 and June 2021, Pilot filed around a dozen patent infringement suits against manufacturers and distributors of portable vehicle jump starter companies, including against Carku's customers.  Esterhay Decl. Ex. E (*Shenzhen Gooloo E-Commerce Co., Ltd. v. Pilot, Inc.*, Case No. 22-cv-02219-RGK-E, ECF No. 30 at ¶¶ 40-52 (C.D. Cal. June 27, 2022) (First Amended Complaint)).

Aside from filing a dozen lawsuits, Pilot also filed numerous patent infringement complaints with Amazon.com ("Amazon") against manufacturers and distributors of portable vehicle jump starters, again, including Carku's customers. *See e.g.*, *id.* ¶¶ 62-66.

Until recently, much of Pilot's litigation focused on its United States Patent Number 10,046,653 ("'653 Patent").  *See e.g.*, *id.* ¶¶42-64.

By the end of 2020, Carku had redesigned its jump starters, including the internal circuit board, to avoid any potential claim of infringement of the '653 Patent ("Redesigned Jump Starter").  In late May 2021, one of Carku's customers notified Pilot of the new circuit design.  Cheng Decl., ¶ 8.  That same customer shipped Pilot a sample Redesigned Jump Starter to analyze it.  Esterhay Decl., Ex. E (Gooloo Complaint) ¶ 66.

On June 4, 2021, counsel for Pilot, Mr. Alex Ruge received the sample.  Over the next few days, Mr. Ruge analyzed the sample but apparently determined that the analysis was beyond his capabilities.  Counsel for Gooloo provided Mr. Ruge with a detailed explanation of the differences in the Redesigned Jump Starters

and explained to him how to test the sample product to see those differences. In late June 2021, Mr. Ruge sent the sample product to be analyzed and tested by a third-party expert, Mr. Okan Saribal. ***Four months after Pilot sent the sample product to its expert for analysis, Pilot filed its application for the '971 Patent.*** Esterhay Decl., Ex. F ('971 Patent)

On July 5, 2022, the USPTO issued the '971 Patent. *Id.* Almost immediately began misleading Amazon into delisting Carku's customers' products, claiming that these jump starters infringe the '971 Patent. At Pilot's request, Amazon delisted many of the jump starter products at issue in this litigation. Esterhay Decl., Ex. G (Carku's Amended Complaint).

### C.     Carku Asserts Claims of Non-infringement, Invalidity, and Various Tort Claims Against Pilot

On November 18, 2022, Carku filed a complaint for declaratory relief against Pilot seeking a declaration that over 120 of its redesigned products sold by its customers do not infringe the '971 Patent. Esterhay Decl., Ex. H. ECF No. 1 ("Complaint.") at ¶¶ 17, 19, 21. ***Those 120 products use over 20 different circuit boards.*** *Id.* at ¶¶ 17, 19, 21, 30, 35. On May 22, 2023, Carku filed its Amended Complaint that also seeks a declaration that the '971 Patent is invalid and damages for Pilot's wrongful weaponization of the '971 Patent against Carku's customers that has resulted in significant lost sales for Carku. *See generally* Esterhay Decl., Ex. G.

To prove its case for non-infringement especially and defend against Pilot's counterclaim for infringement, Carku will likely need to produce its source code as well as internal and external communications, design files, schematics, product specifications, and other highly sensitive, confidential, and trade secret documents to show how the accused products operate and beyond the claims in the '971 Patent. These documents contain apparatuses, circuits, and methods of operations that are

subject matters of Carku's patent applications before the U.S. Patent and Trademark Office ("USPTO"). These documents are relevant to the preparation and prosecution of Carku's patent portfolio.

### D. The Northern District of California's Model Protective Order

On June 8, 2023, the Court entered an interim protective order until the Court resolves the two remaining disputes between the parties: Whether there should be heightened protections for Carku's source code and whether those who obtain highly confidential information should be subject to a patent prosecution bar.

Carku's proposal uses the language adopted by the Northern District of California Model Protective Order. Carku attaches its proposed language as Exhibit A to the Declaration of John Esterhay.

### 1. Heightened Source Code Provision

The Source Code Provision treats source code as HIGHLY CONFIDENTIAL under the current interim protective order and adds additional protections, including:

- In lieu of traditional production, the source code shall be available for inspection at the producing party's office or another agreed-upon location, in a secure room that may be monitored only to ensure there is no unauthorized dissemination of that source code.
- The producing party shall provide paper copies of reasonably necessary source code provisions if requested.
- The receiving party must track those who have inspected the source code for both security and identifying who should be subject to the Prosecution Bar.
- The receiving party cannot copy the source code unless necessary for the case.

## 2.    Patent Prosecution Bar

The Prosecution Bar prohibits any individual who receives "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" and "HIGHLY CONFIDENTIAL – SOURCE CODE" information from being involved in prosecuting patents or patent applications relating to Carku's jump starters for two years.  Esterhay Decl., Exs. A, B.  The Prosecution Bar is *not* retroactive and it does *not* prohibit "challenging a patent before a domestic or foreign agency" like the United States Patent and Trademark Office.  *Id.*

## III.    ARGUMENT

Courts issue a protective order for discovery material upon a showing of "good cause." Fed.R.Civ.P. 26(c)(1).  In general, "good cause requires the moving party to show that specific prejudice or harm will result if the protective order is not issued." *Dynetix Design Solutions, Inc. v. Synopsys, Inc.*, C–11–05973 PSG, 2012 WL 1232105, at *2 (N.D. Cal. Apr. 12, 2012).  This Court has broad discretion "to decide when a protective order is appropriate and what degree of protection is required." *Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1211 (9th Cir. 2002).  This Court also has broad discretion to balance the interests involved.  *See In re Deutsche Bank Tr. Co. Americas*, 605 F.3d 1373, 1381 (Fed. Cir. 2010).

### A.    There is Good Cause to Implement Heightened Protection for Carku's Source Code

Courts "have consistently acknowledged the importance of source code and the fact [that] it is often one of the most valuable assets a company possesses." *Get Seen Media Group, LLC, et al. v. Orion Tiller, et al.*, 220CV11682JAKPDX, 2021 WL 5083741 (C.D. Cal. June 23, 2021) (quoting *Imageware Systems, Inc. v. Fulcrum Biometrics, LLC*, 13-CV-936 (DMS), 2014 WL 12489939, at *1 (S.D. Cal. Nov. 25, 2014)).  For that reason, parties routinely request, and courts routinely grant, protective orders that provide special protections to source code.

*See, e.g., World Champ Tech LLC v. Peloton Interactive, Inc.,* 21CV03202SBAKAW, 2022 WL 2159260, at *2 (N.D. Cal. June 15, 2022) ("Accordingly, the Court finds that the model protective order terms regarding source code should apply."); *OpenTV, Inc. v. Apple, Inc.*, No. 14-CV-1622 (JST), 2014 WL 5079343, at *3 (N.D. Cal. Oct. 9, 2014); *Kelora Sys., LLC v. Target Corp.*, No. 10-CV-4947 (CW), 2011 WL 6000759, at *9 (N.D. Cal. Aug. 29, 2011).

Carku will need to produce its source code in this action to prove its claims for non-infringement and to defend itself against Pilot's claim for infringement. Specifically, Carku will need to produce its source code related to the safety features that make Carku's products a market leader.

Heightened protections for Carku's source code is critical.  Carku's confidential source code, held by Carku as trade secrets, especially as it relates to its safety mechanisms, is the crown jewel of its technology and products.  Carku's unique and top-of-the-market source code is the essential ingredient to the safety features that make Carku's lithium-based jump starters marketable.  Without this source code, Carku could not bring its products safely to market for consumer use. And, with its source code, Pilot or other competitors could copy Carku's unique and innovative safety features.  Disclosure of Carku's source code to Pilot, a competitor, or the public at large would be ruinous to Carku who has spent over a decade developing its technology.  *See* Cheng Decl. ¶¶ 2-6.

Carku proposes using the Northern District of California Model Protective Order source code provisions.  These commonsense provisions add additional security for Carku's most sensitive technology but adds little burden to Pilot.  The Model Protective Order includes a provision governing the production and review of source code, providing among other things that the source code will be made available for inspection only on a stand-alone computer located at the offices of the producing party's outside counsel or other mutually agreed location.  The Model

Protective Order also imposes reasonable restrictions on the review and copying of the source code by the counsel and experts for the opposing party.

Balancing the competing interests of disclosure and confidentiality, this Court, and other courts, around the country routinely adopt and incorporate similar or identical source code protections when source code might be disclosed. *See, e.g., Core Distrib., Inc. v. OxGord Inc.*, No. 2:21-cv-01635-JAK (MAAx), 2021 WL 3290578, at *3-4 (C.D. Cal. Aug. 2, 2021); *Jiaxing Super Lighting Elec. Appliance Co. v. MaxLite, Inc.*, No. 2:19-cv-04047-PSG (MAA), 2020 WL 1433610, at *7-8 (C.D. Cal. Mar. 24, 2020); *Uniloc 2017 LLC v. Microsoft Corp.*, No. 8:18-CV-02053-AG (JDEx), 2019 WL 451345, at *3-4 (C.D. Cal. Feb. 5, 2019); *Blue Spike, LLC v. VIZIO, Inc.*, No. 8:17–cv–1172–DOC–KES, 2018 WL 1889037, at *9-10 (C.D. Cal. Apr. 18, 2018); *Vaporstream, Inc. v. Snap Inc.*, No. 2:17–cv–00220–BRO–KS, 2017 WL 3670020, at *6 (C.D. Cal. Aug. 22, 2017); *Mfg. Automation & Software Sys., Inc. v. Hughes*, No. 2:16–cv–8962–CAS (KSx), 2017 WL 3319108, at *8 (C.D. Cal. Aug. 3, 2017) (Stevenson, J.); *Aerospace Devices, Inc. v. SACS GmbH*, No. 8:16-cv-01157-AG-PJW, 2016 WL 4925907, at *3 (C.D. Cal. Sept. 14, 2016).

The HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY protections in the Interim Protective Order are not sufficient to protect Carku's most valuable trade secrets. The key difference between the current protective order and the Northern District's Model Protective Order for treatment of source code is who actually holds and controls the source code. Under the current protective order, Carku must prepare and produce its trade secret source code in electronic format and produce it to Pilot. This presents two unacceptable risks to Carku: First, Carku is no longer in control of its source code. Carku must rely on opposing counsel to protect Carku's trade secrets. Of grave concern, of course, is that opposing counsel represents one of Carku's top competitors, Pilot, in this litigation, but also in prosecuting Pilot's past and future patents. Opposing counsel has also represented

Pilot in various patent enforcement actions against Carku's customers in federal court, arbitrations, and before the USPTO. Second, it is so easy for intentional and unintentional copying and disclosure of electronic materials. Given the stakes, such a risk is neither necessary nor appropriate. And, such risk is even less appropriate given the minimal burden that such restrictions will put on Pilot.

It is easy for Pilot to dispute the need for heightened protections for its competitor's source code because Pilot has no skin in the game. Pilot will likely not have to produce any trade secret source code to its competitor. Yet, it takes no logical leap to assume Pilot would make the same arguments as Carku if it were in Carku's shoes.

Imposing the heightened protections for source code imposes little burden on Pilot and its experts. Sheridan Ross, PC, Pilot's counsel for this matter, is located in Denver. Perkins Coie, counsel for Carku has an office in Denver, about two miles from Sheridan Ross's office, that could be set up to view Carku's source code in accordance with the protective order. Perkins Coie has *two* offices in the Los Angeles area, less than 50 miles from Mr. O'Brien's office in Irvine, Pilot's local counsel. Even Mr. Joseph McAlexander, the expert witness who will likely serve as an expert witness for Pilot lives in Richardson, Texas, less than 15 miles from Perkins Coie's Dallas office. Given the stakes for Carku, Pilot cannot credibly claim that the source code provisions impose a significant or unjustifiable burden.

Pilot's proffered excuse that Carku's customers have already disclosed the relevant provisions of source code to Amazon is entirely off base. Pilot will claim that Carku's customers disclosed its source code to a third party, Amazon, so there is no need for heightened restrictions. But Carku's customers only disclosed a few lines of Carku's source code, which is nowhere close to what Carku will need to produce in this litigation or what a competitor would need to replicate Carku's safety features. Cheng Decl. ¶ 9. Indeed, disclosure of Carku's source code is an excellent example of why Pilot cannot be trusted with Carku's source code.

Carku's customers sent a small snippet of Carku's source code to Amazon as part of a dispute over Amazon's delisting of Carku's customer's products at Pilot's (wrongful) request.  Amazon apparently sent those letters to Pilot.  Pilot, on the other hand, turned around and ***publicly filed those letters*** containing Carku's source code and other infringement arguments as part of its Amended Counterclaim. Esterhay Decl., Ex. C ¶ 48.

### B.    There is Good Cause to Impose a Narrow Patent Prosecution Bar

There is good cause to implement the narrow, common sense, and widely applied Patent Prosecution Bar as written in the Northern District of California Model Protective Order.  Carku's request is grounded both in fundamental fairness and in common sense.  Any individual who receives or has access to Carku's most sensitive information, especially while working in contentious litigation for a competitor in a lucrative market, cannot then help Pilot draft, file, and negotiate patents on Pilot's behalf.

The determination of whether a protective order should include a patent prosecution bar is a matter governed by Federal Circuit law.  *In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1378 (Fed. Cir. 2010).  A party seeking to include a prosecution bar in a protective order carries the burden of showing good cause for its inclusion.  *Id.*  The Federal Circuit's decision in "Deutsche Bank sets forth four factors this Court must evaluate when determining whether and under what circumstances a patent prosecution bar should be imposed." *Digital Empire Ltd. v. Compal Elecs. Inc. Group*, 14-CV-1688-DMS(KSC), 2015 WL 10857544, at *2 (S.D. Cal. July 20, 2015).

First, the Court must determine whether the facts of this case present a risk of inadvertent disclosure.  Second, "the district court must balance the potential harm to the opposing party from restrictions imposed on that party's right to have the benefit of counsel of its choice." Third, the "party seeking imposition of a patent prosecution bar must show that the information designated to trigger the bar, the

scope of activities prohibited by the bar, the duration of the bar, and the subject matter covered by the bar reasonably reflect the risk presented by the disclosure of proprietary competitive information." Fourth, the Court may consider whether any attorneys should be exempted from the prosecution bar. *Id.* (quoting *Deutsche Bank*, 605 F.3d at 1380-81); *see Applied Signal Tech., Inc. v. Emerging Markets Commc'ns, Inc.*, No. C-09-02180 SBA DMR, 2011 WL 197811, at *2 (N.D. Cal. Jan. 20, 2011).

All four factors weigh in Carku's favor.

First, As discussed in Section III.A above, the stakes for Carku are incredibly high. And, Carku's lawsuit is against a competitor, in a highly competitive and lucrative market. Pilot is also exceedingly litigious. *See* Esterhay Decl., Ex. E (Gooloo Amended Complaint) ¶¶ 40-52.

Unfortunately for Carku, this is not an academic exercise. Pilot has already demonstrated what appears to be a disposition to disclose technical information received to the benefit of its patent prosecution activities. After Carku redesigned its jump starters to avoid any infringement issues, one of Carku's customers notified Pilot of the new circuit design and shipped Mr. Ruge, Pilot's counsel in this matter, a sample so that Pilot could analyze it. The purpose here of course was to *show* Pilot that these new products did not infringe Pilot's patents. Attorneys for Carku's customer even provided Pilot with a detailed explanation of the differences in the redesigned jump starters and explained to Mr. Ruge how to test the sample product to see those differences. But ***four months later,*** Pilot filed its application for the '971 Patent, the same patent that Pilot now seeks a declaration of infringement for Carku's products. *See* Esterhay Decl., Ex. F ('971 Patent). Mr. Ruge was also involved in Pilot's subsequent efforts to de-list Carku's customer's products citing the '971 Patent. *See In re Deutsche Bank Trust Co.*, 605 F.3d at 1380 (holding that attorneys involved in "strategic decisions on the type and scope of patent protection that might be available or worth pursuing" or "strategically

amending or surrendering claim scope during prosecution" generally may be subject to a prosecution bar).

Second, there is virtually no harm done to Pilot in imposing the Prosecution Bar.  Pilot will still be able to retain the same counsel, and the same law firm, Sheridan Ross, to prosecute its *future* patents, and conduct its (unfounded) enforcement activities so long as those who receive Carku's highly sensitive documents in this matter, are also not engaged in patent prosecution.  *Torrey Pines Logic, Inc. v. Gunwerks, LLC*, 19-CV-02195-H-DEB, 2020 WL 6106819, at *3-5 (S.D. Cal. Aug. 25, 2020) (finding good cause to enter a prosecution bar where lead trial counsel and Defendant's in-house counsel was engaged in competitive decision-making).

Third, the Prosecution Bar has a narrow scope and will impose a minimal burden on Pilot.  The Prosecution Bar prohibits an individual who receives "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" and "HIGHLY CONFIDENTIAL – SOURCE CODE" information from being involved in prosecuting patents or patent applications relating to Carku's jump starters for two years.  Esterhay Decl., Exs A, B; *see Applied Signal Tech., Inc.*, 2011 WL 197811, at *2 (finding the Northern District's Model Protective Order Prosecution Bar appropriate).  The Prosecution Bar applies to prosecution of *future* patents, not the '971 Patent as it has already been issued.  The Prosecution Bar is *not* retroactive and it does *not* prohibit "challenging a patent before a domestic or foreign agency" like the United States Patent and Trademark Office.  The Prosecution Bar is narrowly tailored to cover only the individuals who receive Carku's most sensitive information.  It would not bar Sheridan Ross as a law firm from prosecuting Pilot's patents.  And the two-year bar has been repeatedly found to be reasonable and is the baseline in the Northern District of California model rule.  *See Digital Empire*, 2015 WL 10857544, at *7 ("A two-year bar is reasonable."); *Applied Signal Tech.,*

*Inc.*, 2011 WL 197811, at *2 (finding that two-year post-litigation bar was reasonable).

Finally, there is no reason to exempt any of Pilot's attorneys from the patent prosecution bar.

Carku again proposes the commonsense protections from the Northern District of California Model Protective Order.  This Court, and other courts, around the country routinely adopt and incorporate similar or patent prosecution bar provisions.  *See, e.g.*, *Uniloc 2017 LLC v. Microsoft Corp.*, No. 8:18-CV-02053-AG (JDEx), 2019 WL 451345, at *5 (C.D. Cal. Feb. 5, 2019); *Blue Spike, LLC v. VIZIO, Inc.*, No. 8:17–cv–1172–DOC–KES, 2018 WL 1889037, at *8-9 (C.D. Cal. Apr. 18, 2018); *Vaporstream, Inc. v. Snap Inc.*, No. 2:17–cv–00220–BRO–KS, 2017 WL 3670020, at *6 (C.D. Cal. Aug. 22, 2017) (Stevenson, J.); *Aerospace Devices, Inc. v. SACS GmbH*, No. 8:16-cv-01157-AG-PJW, 2016 WL 4925907, at *3-4 (C.D. Cal. Sept. 14, 2016).

For these reasons, the Court should add the Prosecution Bar from the Model Protective Order.

**IV.   CONCLUSION**

For these reasons, the Court should add both the HIGHLY SENSITIVE - SOURCE CODE provisions and the Prosecution Bar from the Model Protective Order.

## V.    PILOT'S POSITION:

### A.    Carku's Position Should Be Stricken.

As an initial matter, Pilot disputes that Carku has complied with the requirements of L.R. 37-2.1. This Local Rule provides in relevant part:

The specification of the issues in dispute, and the parties' contentions and points and authorities as to such issues, may be preceded by an introductory statement from each party, provided that **no party's introductory statement may exceed three pages in length**. When a party states its contentions on a particular issue, **such party must also state how it proposed to resolve the dispute over that issue at the conference of counsel**.

(emphasis added).

Carku's introductory statement is improper. It spans at least six pages.

Further, nowhere in Carku's portion of the stipulation does it state how it proposed to resolve the dispute at the conference of counsel. It cannot. Carku did not put forward any "specific terms of the discovery order to be sought" as required by L.R. 37-1 during the conference of counsel or thereafter until serving its portion of the stipulation at 8:16 pm PT on July 3, 2023. The model protective order on which Carku bases its modifications consists in numerous optional or alternative terms that would result in quite different levels of restriction and corresponding burden. (*See* Ex. B at 10, 12-15.)

Pilot respectfully requests that Gooloo's statement be stricken for its failure to comply with L.R. 37-2.1.

### B.    Pilot's Introductory Statement

This case is the culmination of a multi-year dispute between Carku and Pilot regarding Carku's infringement of Pilot's patent rights. During this extensive litigation history, neither Carku nor its customers have previously filed a motion seeking to protect its alleged source code or any other documents at the level it now

seeks. Notwithstanding the lack of such protections, Carku has freely and repeatedly shared the information that it now claims is a "crown jewel" trade secret *without any protection whatsoever*, including a lack of confidentiality markings.

Carku's counsel in this matter sent at least twelve letters to Amazon stating how its redesigned products functioned with regard to infringement and containing numerous circuit diagrams and multiple section of alleged source code for certain products at issue in this litigation, only one of which is reproduced below:

```
/*********************************************
** 函数名   : comm_to_cable
** 输入参数: 无
** 输出参数: 无
** 功能描述: 与电瓶夹通信
*********************************************/
void Comm_to_cable(void)
{
        static u8 com_cnt;
        if(f_rec_ok)
        {
                f_rec_ok = 0;
                VT_EN = 1;
                com_cnt = 0;
                f_come_ok = 1;
                LowPowerDelay = T2_15s;
        if(RegRx == 0xa050)
        {
                if(f_discharge_temp||f_bat_fireuvp||f_bat_over)
                {
                        senddata |= 0x0001;
                }
                else
                {
                        senddata &= 0xFFFE;
                }
                StartSend(senddata); //
        }
        else if(RegRx == 0x50a0)
        {
                StartSend(0x50a3); //
        }
        }
        else if(++com_cnt > T20_100ms)
        {
                com_cnt = T20_1s;
                f_come_ok=0;
        }
}
```

(Ex. 1 at 7.) These numerous letters contain **no** confidentiality markings, including with respect to the alleged source code. (*See generally* Ex. 1.) In the Amazon APEX proceeding related to whether Carku's HULKMAN branded products infringed Pilot's '971 Patent ("HULKMAN APEX"), Carku did not seek any special protection for its information. Ruge Decl., ¶ 6. Nonetheless, Carku produced at least ***thirty-five additional pages*** of circuit diagrams and alleged source code. *Id.*, ¶ 7. Carku also provides extensive technical analysis of the same, all without any confidentiality markings. *Id.* Yet, these are precisely the "apparatuses, circuits, and methods of

JOINT STIPULATION RE: SUPPLEMENTING PROTECTIVE ORDER

operations" that Carku now argues above should be subject not only to extremely burdensome source code review procedures but also should subject Pilot's attorneys and experts to a prosecution bar. *See* Carku *supra* at 5.

There is no good cause to place extremely burdensome source code review procedures in place for information that Carku has willingly produced without qualm in the past. Indeed, Carku presents no admissible evidence of specific prejudice or even potential harm that could befall Carku under the current protective order provisions, which already place extensive protections on documents designated HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY.

Further, a prosecution bar is unworkable here and would be extremely prejudicial. Carku has already extensively shared the same information that it would now designate with third parties *without* confidentiality protections. Pilot, its counsel, and outside experts have received this non-confidential circuit and source code information. Attorneys involved in patent prosecution and proceedings before the Patent Office for Pilot **and who represent other clients** involving jump starters have analyzed this information. Ruge Decl., ¶ 9. If the Court grants this protective order and it is used to designate these materials, these attorneys would be barred from not only continuing their ongoing representations of Pilot before the Patent Office upon viewing the materials, and also for other clients. *Id*.

Ultimately, Carku presents no evidence that there is any information that it has not already shared without *any* confidentiality protections, much less that there is a need for protections beyond those already in place.

### C.  Argument

The most fundamental issue with Carku's position is the lack of any competent evidence supporting that position. Even at this stage, Carku relies on mere allegations and unsupported conjecture at all points to hypothesize harms. On this basis Carku seeks to add two bundles of provisions to the current protective order that would, first, create an additional category of protection for documents designated "SOURCE

CODE" and, second, broadly bar anyone receiving even "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information from prosecution work in the field for years after final termination. Carku bears the burden of showing that these provisions are necessary and fails to carry that burden.

During the parties meet and confer, Pilot proposed that the parties use the Court's protective order. It was entered, after modification to include the HIGHLY CONFIDENTIAL designation, as the Stipulated Order. (Ex. 2, ECF No. 40, Interim Stipulated Protective Order ("Stipulated Order").)[1] Pilot objected to the inclusion of source code review provisions and any form or prosecution bar.

After setting out the legal standards that apply, Pilot first addresses the problems with the evidence presented by Carku that apply to both issues and then addresses the each sets of provisions in turn.

> **1.      Legal Standard - Carku Bears the Burden of Showing Specific Prejudice or Harm *Will* Result if the Protective Order is not Modified.**

"It is well-established that the fruits of pretrial discovery are, in the absence of a court order to the contrary, presumptively public." *San Jose Mercury News, Inc. v. U.S. Dist. Ct.--N. Dist. (San Jose)*, 187 F.3d 1096, 1103 (9th Cir. 1999). "Rule 26(c) authorizes a district court to override this presumption where 'good cause' is shown." *Id*. "[I]f good cause is not shown, the discovery materials in question should not receive judicial protection." *In re Agent Orange Product Liability Litig.*, 821 F.2d 139, 145 (2d Cir.1987).

"For good cause to exist, the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted." *Phillips*, 307 F.3d at 1210–11. "'Broad allegations of harm, unsubstantiated by

---

[1] Ex. 2 at § 2.6 ("'HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items: extremely sensitive "Confidential Information or Items," disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means."

JOINT STIPULATION RE: SUPPLEMENTING PROTECTIVE ORDER

specific examples or articulated reasoning, do not satisfy the Rule 26(c) test.'" *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (quoting *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3rd Cir.1986)).

**2.     Carku Fails to Present Any Competent Evidence that there Remains Relevant Confidential Source Code or that Carku Will Suffer Any Harm.**

Although Carku says many things in its statement above, much of it rests on nothing. Carku presents the following as evidence:

1.  Pilot's First Amended Counterclaim (Ex. C)

2.  Pilot's Answer to the First Amended Complaint (Ex. D)

3.  Gooloo's First Amended Complaint (Ex. E)

4.  The '971 Patent (Ex. F)

5.  Carku's First Amended Complaint (Ex. G.)

6.  Carku's Complaint and the '971 Patent (Ex. H)

7.  A declaration of counsel authenticating the above (Esterhay Decl.)

8.  A declaration of Ming Cheng (Cheng Decl.)

Pilot does not dispute that its own allegations and admissions in Exs. C and D as well as the '971 Patent speak for themselves to the extent that they have any bearing on this dispute.

Carku's and non-party customer's allegations, cited extensively in Carku's argument, are not evidence and cannot support a good cause showing. Thus, Exhibits E, G, and H are of no importance here and cannot be relied on. Pilot objects to their inclusion as irrelevant hearsay.

Carku attempts to make an end run around the inadmissibility of allegations through the Cheng Declaration, which restates much of Carku's hagiography from its complaints in the same general terms. *Compare* Cheng Decl., ¶¶ 2-8 *with* Ex. G, ¶¶ 13-14, 16, 29. However, the Cheng Declaration is itself not competent evidence. L.R. 7-7 requires that supporting declarations be "prepared in conformity with L.R.

-19-                    2:22−cv−08471−HDV−KS
JOINT STIPULATION RE: SUPPLEMENTING PROTECTIVE ORDER

7-7." L.R. 7-7, in turn, requires that declarations "conform as far as possible to the requirements of F.R.Civ.P. 56(c)(4)." This Rule requires declarations be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." The Cheng Declaration does none of these things. Other than noting a job title and that he reviewed a few documents, it provides no foundation for his statements. Cheng Decl., ¶¶ 1-9. Further, it only states that the information is "correct to the best of my knowledge and belief," rather than based on any personal knowledge or other competent evidence as required. *Id*. at 4. Additionally, the Cheng Declaration is not sworn under penalty of perjury as required for unsworn declarations by 28 U.S.C. § 1746. Pilot objects to the inclusion of the Cheng Declaration.

Carku fails to present any competent evidence that it *has* source code that is has kept confidential, much less that it holds it as a trade secret or that it relates to any alleged "innovative safety features" that have a bearing on the claims *See* Carku *supra* at 8. Even if the Cheng Declaration is credited, it speaks only to the source code appearing in Carku's letters to Amazon. Cheng Decl., ¶ 9. It says nothing about the *dozens* of additional pages of circuit diagrams and source code produced in the HULKMAN APEX without any confidentiality designations *or* whether other information exists. *Id*.; Ruge Decl., ¶ 7. The innovative safety features at issue in this case and for which evidence exists are Pilot's proprietary, patented switching technology. (Ex. F.) Carku has copied this technology and freely shown off the alleged code that resulted from that copying. Carku should not be believed in now claiming without support that this code is some crown jewel trade secret merely because an attorney argues as much.

### 3. There is No Good Cause for Onerous Source Code Review Provisions.

This litigation already involves extensive protections for allegedly confidential documents, including heightened protections beyond those in the Court's model

protective order. (Ex. 2.)[2] The current Stipulated Order definitively displaces the presumption that produced documents are presumptively public and bars use of marked information for other purposes. (*Id.* at 1, 13.) For the highest level of protection, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, the Stipulated Order already requires careful treatment, limits how such documents can be handled, who can receive them, and disclosure of whom they are shared with. (*Id.* at 7-11.) These limits already reduce access to such information to reasonably necessary outside counsel and experts of the opponent. (*Id.* at 9.) Under the Stipulated Order, Pilot or Carku employees and others cannot access any AEO information. (*Id.*)

Such protections are already sufficient to protect any of the information likely to be produced in this case. Carku has already disclosed extensive circuit diagrams and alleged source code for its products without any confidentiality protections. This has occurred in multiple instances, some of which are not addressed whatsoever by Carku. Ruge Decl., ¶ 7. Further, Carku has stated that such freely shared information applies to all discussed products, describing them as functioning in the same fashion, using the same circuits, and containing the same alleged source code. (*See generally* Ex. 1; Ex. C, ¶¶ 46-49, 84-89.) On this evidentiary record, there is simply no reason to believe that Carku has relevant information distinct from the information that it has already freely shared in claiming, repeatedly, that its products function the same regarding infringement. (*Id.*) There is no good cause to protect such information, much less in the extremely burdensome manner that Carku proposes.

---

[2] *E.g.*, Ex. 2, § 7.3 ("Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to: (a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the 'Acknowledgment and Agreement to Be Bound' that is attached hereto as Exhibit A; (b) Experts of the Receiving Party (1) to whom disclosure is reasonably necessary for this litigation and (2) who have signed the 'Acknowledgment and Agreement to Be Bound' (Exhibit A) and (3) as to whom the procedures set forth in paragraph 7.4, below, have been followed; . . .") and § 7.4(a) ("Unless otherwise ordered by the court or agreed to in writing by the Designating Party, a Party that seeks to disclose to an Expert (as defined in this Order) any information or item that has been designated 'HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY' pursuant to paragraph 7.3(b) first must make a written request to the Designating Party that . . .")

The restrictions in Carku's proposal require that this same information be reviewed with extremely limited tools in a fishbowl room where Carku can "visually monitor the activities of the Receiving Party's representatives during any source code review." (Ex. A at 12.) There is no provision for tools that would allow comparison between source code (assuming unproven differences across products) and, indeed, Carku's proposal forbids the use of tools that would allow for such comparison through copying code. (*Id.* at 12-13 ("shall not convert any of the information contained in the paper copies into any electronic format".)

Carku's argument as to why there is good cause consists largely of citations to cases where *stipulated* protective orders were entered. Carku *supra* at 7-9. These cases generally involve *software companies* selling products the functioning of which cannot be established by simple testing and analysis of a publicly available consumer product. Here, not only the circuits but also their functioning controlled by any source code are publicly available to anyone that buys the jump starter products. Indeed, Pilot's infringement analysis by Mr. McAlexander in the HULKMAN APEX relied primarily on analyzing and testing purchased Carku products. (*E.g.*, Ex. 4 at 4-16.) Pilot relied on Carku's circuit diagrams from the letters to Amazon merely to confirm what testing had already shown and to display it in a graphical format. (*E.g.*, *id.* at 17-18.) Despite having Caku's source code, Pilot did not need or use that to show infringement. (*Id.*)

Carku has provided no evidence that further necessary relevant source code exists that it would produce in relation to any claims. Even if the Cheng Declaration is credited, it only speaks to there being other code that would be needed to fully "replicate" the source code of Carku's products. Cheng Decl., ¶ 9. But Carku's full source code is not at issue or even relevant, only certain claimed functions matter, and only a few of those are in dispute. (Ex. 7, '971 Patent, at col. 5-6; Ex. G, ¶¶ 71-75.) Carku has already freely disclosed the portions of source code it thought were relevant to infringement and asserted that code was present in all of the numerous

products Carku discussed. (Ex. 1.) Indeed, there is no explanation from Carku of why it would need or even want to present additional source code in relation to any issue in this case. Carku *supra* at 5-6.

Carku falls far short of showing any "specific prejudice or harm **will result** if no protective order is granted." *Phillips*, 307 F.3d at 1210–11 (emphasis added). At most, Carku provides legally insufficient "'[b]road **allegations** of harm [that] do not satisfy the Rule 26(c) test.'" *Beckman Indus., Inc.*, 966 F.2d at 476 (emphasis added). Thus, there is no good cause to place onerous restrictions on the parties' ability to review and analyze source code here beyond those already in the Stipulated Order.

### 4.      There is No Good Cause for a Prosecution Bar.

Pilot agrees with Carku that whether there is good cause for a patent prosecution bar is determined under Federal Circuit precedent. *In re Deutsche Bank Tr. Co. Americas*, 605 F.3d 1373, 1378 (Fed. Cir. 2010).

Pilot, however, disagrees that the Federal Circuit has set forth a four-factor test as Carku argues. Carku *supra* at 11. Rather, the Federal Circuit uses balancing test requiring that a "party seeking imposition of a patent prosecution bar must show that the information designated to trigger the bar, the scope of activities prohibited by the bar, the duration of the bar, and the subject matter covered by the bar reasonably reflect the risk presented by the disclosure of proprietary competitive information." *Id*. at 1381. The subsidiary issues of whether an individual should be exempted are considered "on a counsel-by-counsel basis" after such a bar is shown to be warranted. *Id*.

The provisions already in place here are sufficient without any additional protections. As the Federal Circuit explained, "[t]ypically, protective orders include provisions specifying that designated confidential information may be used only for purposes of the current litigation." *Deutsche Bank*, 605 F.3d at 1378. "Such provisions are generally accepted as an effective way of protecting sensitive information while granting trial counsel limited access to it for purposes of the

litigation." *Deutsche Bank*, 605 F.3d at 1378. The Stipulated Order here is of this type. (Ex. 2.) It already severely limits who can *access* information to those that need it for the litigation in addition to otherwise limiting how the information can be used. (*Id*. at 8 and 9 ("reasonably necessary for this Action").)[3] Consistent with the Federal Circuit's explanation, the Stipulated Order needs no further protections.

### a.   There is No Risk of Pilot Using Source Code for Competitive Advantage.

As the Federal Circuit explained, "denying access to a party's outside counsel on the ground that they also prosecute patents for that party is the type of generalization counseled against in" its precedents. *Deutsche Bank*, 605 F.3d at 1379 (cleaned up). " The facts, not the category must inform the result." *Id*. Here, where the facts do *not* show competition between the parties or that competitive decisionmakers would have access to documents designated HIGHLY CONFIDENTIAL under the Stipulated Order, further modifications should be denied.

There is no evidence in the record that Pilot is a competitor of Carku. Much of Carku's argument on all issues revolves around an unsubstantiated claim that Pilot and Carku are competitors. Carku *supra* at 1, 8-11. Carku goes so far as describing Pilot as "one of Carku's top competitors." *Id*. at 9. There is no basis for these claims. In fact, Carku's own evidence shows the opposite. Carku's customer, through the same counsel, has stated that "Pilot is not primarily in the business of making battery chargers, jump starters, or other power products." (Ex. E, ¶ 32.) As Mr. Esterhay correctly stated and Pilot did not dispute, "no jump-starters, battery chargers, or other power products appear on the Pilot home page or anywhere on its website." (*Id*.,

---

[3] *E.g.*, Ex. 2, § 7.2 ("Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to: (a) the Receiving Party's Outside Counsel of Record in this Action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this Action; (b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary . . . ")

-24-                           2:22−cv−08471−HDV−KS
JOINT STIPULATION RE: SUPPLEMENTING PROTECTIVE ORDER

¶ 34.) Pilot has "no current model" of jump starter products. (*Id.*; *see also* Ex. 3).) It is unclear how Carku and Pilot could be competitors in the jump starter manufacturing business given that Pilot has never manufactured jump starters, much less be "top" competitors. (*See* Ex. H, ¶ 13 ("Carku is one of the largest and most well-known manufacturers of portable jump start devices."))

Likewise, there is no evidence that anyone that would have access to documents designated HIGHLY CONFIDENTIAL under the Stipulated Order is involved in competitive decision making. As noted above, the Stipulated Order already bars sharing such documents with anyone other than outside counsel and properly designated experts. (Ex. 2 at 7-11, e.g., § 7.3 quoted *supra* n.2.) Carku provides a tale of woe about how Mr. Ruge analyzed publicly available products, the details of which Carku gets wrong and that is supported by no evidence. Carku *supra* at 4-5. But even this contrived retelling has nothing to do with any circuit diagrams or source code that Carku provided to Amazon, much less inadvertent disclosure of any documents marked confidential. (*Id.*) As noted above, analysis of the commercial product is sufficient. (Ex. 4 at 1, 4-16.) Indeed, there is no suggestion anywhere in the record that Pilot or its counsel has violated *any* protective order in *any* of the numerous proceedings involved in the dispute or otherwise inadvertently disclosed *any* marked documents. Carku can show no legitimate risk, much less that "specific prejudice or harm will result" to Carku as required to meet its burden. *Phillips*, 307 F.3d at 1210–11.

### b.    A Prosecution Bar Would Be Severely Prejudicial to Pilot and its Counsel.

"Even if a district court is satisfied that" the risk of inadvertent disclosure or competitive use exists, "the district court must balance this risk against the potential harm to the opposing party from restrictions imposed on that party's right to have the benefit of counsel of its choice." *Deutsche Bank*, 605 F.3d at 1380. "In making this determination, the court should consider such things as the extent and duration of

counsel's past history in representing the client before the PTO, the degree of the client's reliance and dependence on that past history, and the potential difficulty the client might face if forced to rely on other counsel for the pending litigation or engage other counsel to represent it before the PTO." *Id.* at 1381.

Pilot has a long and extensive history with its litigation and prosecution counsel from Sheridan Ross P.C. Mr. Ruge, Pilot's counsel in this litigation, has represented Pilot for years, in a variety of matters, including the proceedings related to Pilot's infringement dispute with Carku. Ruge Decl., ¶ 1. Likewise, other attorneys at Sheridan Ross have represented Pilot in numerous matters over the years, including patent prosecution. (Ex. F at 1; *see also* Ex. 3.) Sheridan Ross is an IP Boutique with a limited staff of approximately forty-nine attorneys and patent agents, a fraction of which are involved in litigation. Ruge Decl., ¶ 8. Contrary to Carku's unsupported assurances that a prosecution bar would "impose a minimal burden on Pilot," the burden would be extreme. *See U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984) ("Because the present litigation is extremely complex and at an advanced stage . . . forcing USS to rely on newly retained counsel would create an extreme and unnecessary hardship."). This case is the culmination of long dispute that has been handled by a small team of attorneys representing Pilot. It would be prejudicial to require that Pilot change counsel for either its prosecution or litigation at this stage. *Id.*

Pilot respectfully requests that the Court deny Carku's motion to modify the protective order already in place.

JOINT STIPULATION RE: SUPPLEMENTING PROTECTIVE ORDER

Dated:  July 13, 2023

**PERKINS COIE LLP**


By: */s/ John D. Esterhay*
    Kevin J. Patariu, Bar No. 256755
    John D. Esterhay, Bar No. 282330
    Oliver M. Gold, Bar No. 279033
    Heath L. Hyatt, *pro hac vice*

*Attorneys for Plaintiff and Counterclaim-Defendant*
*Shenzhen Carku Technology Co., Ltd.*


Dated:  July 13, 2023

By: */s/ Alex W. Ruge*

Sean A. O'Brien, CA Bar No. 133154
sao@paynefears.com
PAYNE & FEARS LLP
Attorneys at Law
4 Park Plaza, Suite 1100
Irvine, California 92614
Telephone: (949) 851-1100
Facsimile: (949) 851-1212

Alex W. Ruge (*pro hac vice*)
SHERIDAN ROSS P.C.
1560 Broadway, Suite 1200
Denver, Colorado 80202 5141
Telephone: (303) 863 9700
Facsimile: (303) 863 0223
E-mail: aruge@sheridanross.com
E mail: litigation@sheridanross.com

*Attorneys for Pilot, Inc.*

JOINT STIPULATION RE: SUPPLEMENTING PROTECTIVE ORDER